SAMUEL STILWELL *et al.*, Respondents, *v.* COMMERCIAL INSURANCE COMPANY, Appellant.

### April 10, 1876.

1. Freight is insurable and recoverable while the goods are so situated as to create a well-grounded expectation of freight.

2. Where a marine insurance is "against a total loss of any part of said boat or barge's freight, at and from St. Louis to New Orleans," the policy covers freight contracted for and to be shipped on the way, as well as that on board when the vessel leaves port.

2. Where the insurance was against total loss of freight of a boat and barge, and the barge was lost and her cargo transferred to the boat, and freight earned upon it, *held*, that this fact did not prevent a recovery for the loss of freight which would have been earned but for the destruction of the barge.

4. Where some of the plaintiffs became bankrupt after the commencement of the suit, and before judgment, the fact that the assignee was not made a party is no ground for reversing the judgment.

APPEAL from St. Louis Circuit Court.

*Affirmed.*

*Samuel N. Holliday*, for appellant, cited: Amis *v.* Steamboat Louisa, 9 Mo. 621; Gleim *v.* Steamer Belmont, 11 Mo. 112; Clark *v.* United Ins. Co., 7 Mass. 365; Williard *v.* Millers', etc., Ins. Co., 24 Mo. 561; Buchanan *v.* Ocean Ins. Co., 6 Cow. 318; Ridyard *v.* Phillips, 4 Blatchf.

443; Lord *v.* Neptune Ins. Co., 10 Gray, 109; Davy *v.* Hallett, 3 Caine, 16; Forbes *v.* Aspinwall, 13 East, 327; Watson *et al. v.* Ins. Co. of South America, 3 Wash. 1; McGaw *v.* Ocean Ins. Co., 23 Pick. 405; 2 Ph. on Ins. 20–21; 2 Pars. Mar. Law, 69.

*Rankin & Hayden,* for respondents, cited: Thewing *v.* Ins. Co., 10 Gray, 457; Lord *v.* Neptune Ins. Co., 10 Gray, 113; American Ins. Co. *v.* Curtis, 4 Wend. 45; 15 Mass. 324; Tenscolt *v.* Christie, 2 Brod. & B. 320; Davidson *v.* Willasey, 1 M. & S. 321; Warre *v.* Miller, 7 D. & R.; *s. c.,* 4 B. & C. 538; Devaux *v.* J'Anson, 7 Scott, 507; *In re* Clark, 3 B. R. 123; Samson *v.* Barton, 4 B. R. 1; Foster *v.* Hackley, 2 B. R. 131; Manson *v.* Horrick, 100 Mass. 323.

BAKEWELL, J., delivered the opinion of the court.

This was action to recover $2,000, and interest, on a policy of insurance upon freight of steamer "Commonwealth" and barge "W. B. Dance," against total loss of any part of said steamer's or barge's freight, at and from St. Louis, Mo., to New Orleans, La., in December, 1871.

The petition alleges that plaintiffs were owners of the steamboat "Commonwealth," and charterers of the barge "Dance;" that plaintiffs, Samuel and Enoch Stilwell and Daniel R. Powell, were partners, and as partners, and on account of the owners, they, on December 19, 1871, made a contract of insurance with defendant, according to the terms of the contract set out in full below; that, at the time this insurance was made, the boat and barge were about to start on a voyage from St. Louis to New Orleans and intermediate points; that the steamboat and barge had each a partial cargo on board, and the rest of their cargoes, to the full extent of their carrying capacities, contracted and agreed for; that the freight on that part of said barge's cargo loaded at St. Louis was $2,298.22 in value; that the freight on all of said barge's cargo was over $4,000; that said boat and barge left St. Louis on or about Decem-

ber 19, 1871 ; that, on December 20th, and while navigating the Mississippi river on said voyage, said barge met with an accident of navigation, by which she was sunk so that she could not be raised, but became a total loss ; that by said accident the voyage was, so far as the barge was concerned, broken up ; that, owing to a peril insured against, the barge did not and could not earn any freight, and that the whole amount of the barge's freight, which was the property of the plaintiffs, was totally lost to them, by which they suffered a loss of over $4,000.

The answer denied nearly all the allegations of the petition except that the contract of insurance was made as stated by the plaintiffs. The defendant set up, however, that the barge was chartered by the owners of the steamboat "Commonwealth," and was by her towed to Cairo, with a possibility of taking the barge to New Orleans ; and claimed that the policy did not cover any specified amount on either said boat or barge, but covered $2,000 of freight on both the boat and barge, and that, whether the freight was all on the boat or all on the barge, or partly on each, it was equally covered by the policy ; alleged that the cargo of the barge was on deck, and was saved and transferred to the boat, and by the boat conveyed to its destination, and that the freight thereon was earned by the boat and barge, and was collected by the owners of the boat. The defendant further alleged that the freights on the boat and barge were insured in the Home Insurance Company, and that the plaintiffs were endeavoring to collect double insurance.

The reply denied the allegations in the nature of new matter contained in the answer, and alleged that both boat and barge started on the voyage to New Orleans, and at the time of the accident were bound thither ; admitted that a part of the barge's cargo was, on the sinking of the barge, transferred to the boat, and by it carried to New Orleans, but denied that the freight on such cargo was earned by the boat and barge, or collected by the owners of the boat ;

admitted that there was a policy on the same freights in the Home Insurance Company, to the amount of $1,000, but denied that there was any double insurance. The policy is in the form common in cases of insurance on freight, and reads as follows:

"*St. Louis, December 19, 1871.*
" *To Commercial Insurance Company, of St. Louis:*

"Insurance is wanted by Stilwell, Powell & Co., for account of owners of steamer 'Commonwealth,' loss, if any, payable to assured, upon freight of steamer 'Commonwealth' and barge 'W. B. Dance,' against the total loss of any part of said steamer's or barge's freight, at and from St. Louis, Mo., to New Orleans, La., by the dangers of navigation or fire, with the privilege of lightering, towing, and reshipping, in the sum of $2,000; rate, 1-4 per cent., $25.00."

The application was signed for the plaintiffs, and across the face of it is the printed word "accepted," and this acceptance is signed, "John B. McDowell, jr., sec'y."

The evidence showed that, when the above insurance was taken out, the "Commonwealth" and the barge "Dance" were at St. Louis partially loaded, and about to start to New Orleans; that the river was very low, and that the barge "Dance," which had been a steamboat, and was of large carrying capacity, was taken by the master, to enable him to comply with numerous engagements he had made for freights; that, on December 20, 1871, when the boat and the barge left St. Louis, the boat had from 100 to 150 tons of cargo, the freight on which amounted to $1,054.71, and that the barge had from 225 to 250 tons on board, the freight on which amounted to $2,298.22; that the boat had capacity for about 100 tons of cargo more than what she had on board, and that the barge had capacity for about 350 tons in addition to her cargo shipped at St. Louis; and that, in arranging for cargo to be taken on at way points between St. Louis and Cairo, calculations

were made by the agents at St. Louis with regard to the
above facts, and to the additional fact that, as the barge
drew much less water than the boat, the principal part of
the engaged freights would have to be taken on her, and
not on the boat.   As usual in times of low water, freights
were very plenty, and shippers at points between St. Louis
and Cairo, anxious to get their goods to market, were mak-
ing contracts at St. Louis, by which they secured transpor-
tation beforehand.   Thus, while the boat and barge were
"up" for New Orleans, shippers below contracted with the
agents of the boat and barge at St. Louis, and the master
had agreed with them, before he left St. Louis, to take on
that trip, at Kaskaskia, 1,200 barrels of flour ; at Rockport,
300 barrels ; at Willard's, from 800 to 1,000 sacks of corn,
and, at Cape Girardeau, between 1,400 and 1,600 barrels of
flour, at rates which were fixed, on 'Change at St. Louis,
between the agents of the owners and these shippers or
their agents.   The engaged freight, according to the rates
thus fixed, amounted to about $4,500.   In making these
contracts for goods thus to be taken at points below St.
Louis, the master states that specific engagements were
made for the barge, and specific engagements for the boat.
Thus, from 350 to 400 tons were engaged especially for the
barge, the master calculating that she could, in view of her
capacity, carry that amount in addition, at the then stage of
the water.

On December 20th the boat and barge left St. Louis for
New Orleans.   When near Ste. Genevieve Island the barge
met with an accident of navigation, and sunk in such a
manner that it could not be saved nor repaired.   No other
boat or barge could be procured to take its place, and, in
consequence of this, the master was forced to put the barge's
cargo—that is, the cargo the barge had on her when she left
St. Louis—on board of the steamboat "Commonwealth."
For this cargo so received by her, the boat gave to the
barge a bill of lading, which was read in evidence, the boat

agreeing to transport the barge's cargo from the place of disaster to its destination, at the same rate of freight at which this cargo was to have been transported from St. Louis. This was the usual rate; the testimony showing that rates of freight from points between St. Louis and Cairo to Vicksburg and New Orleans were the same as from St. Louis to Vicksburg and New Orleans. The "Commonwealth" then started down the river, but, being overloaded by having the barge's cargo aboard, she was forced to wait two weeks for water. The river rising, she went on her way. Owing to the accident to the barge, all the freight-money on merchandise engaged to be taken, both by boat and barge, at way points between St. Louis and Cairo, to the amount of about $4,500, was lost, with the exception of the freight on about fifty tons of flour, which the boat was forced to take, because the shippers who had contracted with the master for its carriage had left it exposed on the bank of the river. The testimony of the master shows that, if it had not been for the accident to the barge, he could have taken all the engaged merchandise through to New Orleans without trouble. The "Commonwealth" arrived at New Orleans, and there delivered her cargo, as well as the merchandise she had agreed to deliver for the barge, and collected freight for all the merchandise which she delivered. Upon notice being given to the defendant of the loss, it denied it was liable, in any amount, under the policy. The evidence showed that there was, besides the present insurance, $1,000 on the same subject-matter in the Home Insurance Company, and $1,000 in the North Missouri Insurance Company.

We have, for the purposes of this opinion, adopted the statement of plaintiffs' counsel, which is perspicuous and accurate. To that statement it is proper to add that the defendant, on the trial, objected to all evidence as to freights engaged between St. Louis and Cairo for the boat or barge.

One of plaintiffs' witnesses, Carroll, a steamboat agent,

testified that he engaged the freight for the boat and barge between St. Louis and Cairo, and did not recollect whether he spoke of the barge when he engaged freight. He said it was unusual. to speak of the barge in such cases.

Sedam, one of the plaintiffs, swore that specific engagements were made for the barge and specific for the boat, and that he attended to it.

Captain Spoods testifies that it is customary to make engagements for freight for the boat and barge together, as that gives the privilege of carrying on the boat or barge ; and that, nine-tenths of the time, the shipper does not know of any barge till the bill of lading is signed.

The notice of proof of loss was introduced by plaintiffs, in which they only claim $1,149.12.

The defendant introduced no evidence. 。

At the close of the plaintiffs' case the defendant asked these instructions, which were all refused by the court, the defendant excepting :

1. " The court declares the law to be that, upon the whole case made by the evidence, the plaintiffs are not entitled to recover. "

2. " If the court, sitting as a jury, believe from the evidence that all the cargo shipped on the " Commonwealth " and barge " W. B. Dance," on the voyage in question from the port of St. Louis, was transported and delivered, on said voyage, by the steamer " Commonwealth," then the plaintiffs are not entitled to recover in this action."

3. " The court declares the law to be that the plaintiffs are not entitled to recover in this action for the loss of any freight-money that was to have been received for goods, wares and merchandise, and other property that were to have been obtained by both said boat and barge after leaving the port of St. Louis on her said voyage."

4. " The court declares the law to be that the policies of insurance on the freight list of the steamboat " Commonwealth " and barge " Walter B. Dance " attached to the

freight list of all the cargo on board of said boat and barge when they left St. Louis on said voyage, and to the amount of the freight list so on board when they left St. Louis, the plaintiffs can in no event recover."

5. "If the court, sitting as a jury, believe from the evidence that the plaintiffs did not have their freight list covered by the policy sued on fully insured, then they can only recover of the insurance companies insuring same that proportion of the loss that the sum insured bears to the whole freight list covered by terms of policy, and can only recover of each insurance company its proportion of such sum so recoverable."

There was a verdict and judgment for plaintiff for the amount of the policy and interest, and, all exceptions having been saved, the cause is brought to this court by appeal.

It seems quite clear that the boat and barge were two bottoms. They were recognized as such, throughout, by both parties to this transaction. The insurance is against a total loss of the freight of the boat, and also of the freight of the barge ; when the freight was transferred from the barge to the boat, a bill of lading was given and received, as usual when one vessel takes the cargo of another ; and the captain swears that the freight was engaged especially in reference to her, and separate engagements made for the boat ; and, though Carroll does not confirm this, he does not contradict it.

There was a total loss of the barge's freight. After the accident the barge certainly could earn no freight. Her freight then was, beyond all contradiction, lost ; and it can make no difference in this case whether her cargo was deposited on the river bank, or carried to its destination by her consort, the boat. The cargo may have reached its destination, and freight may have been earned for carrying it ; but this freight was not earned by the barge.

Nor can it be said that the freight of the barge was

earned by the boat, in any sense that will relieve the insurers. It is true that the " Commonwealth " carried to its destination the cargo which was on the " Dance," but by so doing she became incapacitated to take on board the cargo she had engaged; and this not only prevented her from carrying her engaged freight, but, by causing a delay of two weeks, caused her owners heavy loss. More than $4,000 worth of freight was lost by the accident. If there had been no shipwreck of the barge, and her freight had not been transferred to the boat, then her whole carrying capacity could have been devoted to engaged freight, and the steamboat and barge, as one bottom, could have earned nearly $8,000, taking together the freight on the cargo on board and that on the cargo engaged; or, if you consider the vessels as two bottoms, as they really were, the barge lost the freight of the cargo transferred to the boat, $2,298; and the boat, by having to make room for the barge's cargo, lost engaged freight, which she would have otherwise carried, which would have brought the sum up to over $4,000. There was, then, a total loss of some part of the steamer's or barge's freight, and the part so lost exceeded $4,000—the total amount of insurance on the freight list.

The total freight that the boat and barge together would have carried, in the absence of accident, is $7,852. Of this $3,352 was on cargo shipped at St. Louis, and the balance on cargo to be taken up at way points between St. Louis and Cairo. The total insurance on freight was $4,000, of which $2,000 was with defendant. It is contended by defendant that the insurance covered only the freight to be earned on the cargo taken at St. Louis; that there was an insurance of $4,000 on $4,000 of freight, and not $4,000 on $8,000 of freight; that for half the freight plaintiffs were their own insurers, and that defendant is liable only for that part of the loss which the amount it insured bears to the whole property at risk. But no authority is cited

to support this interpretation of the facts of the case, and we think the argument of counsel as to these points by no means convincing.

The subject of insurance here was the profit to be made by carrying the cargo. This is an interest that cannot be valued like a cargo. A large portion of freight is consumed in expenses. The total value of a freight list on the Mississippi could, perhaps, not be approximately determined. The cargo is at risk only from the time it is shipped, but the freight to be earned by carrying cargo is at risk from the moment the voyage begins. The freight on the goods to be received on the way is as much risked as the freight actually on board; the compensation in either case is not existing, but inchoate. If a boat leaves St. Louis for New Orleans without a cargo, to take her load at points on the way, the freight she expects to receive is insurable. " The inception of freight is breaking ground, but, in the law of insurance, if goods are so situated as to create a well-grounded expectation of freight being earned, freight is insurable and recoverable." *Curling* v. *Long*, 1 B. & P. 634. "In almost all cases on this subject," said Baron Park, " the ship was lost before anything was on board." In the case at bar, the cargo was contracted for on terms by which the boat and barge, but for accidents, must have earned nearly $8,000 of freight, and more than half of this they lost by becoming incapacitated to carry it, being the total loss of a part of the freight against which they insured. The insurance was not on a cargo " at and from St. Louis to New Orleans," but on freight to be carried by these vessels on a trip between those points. The idea that the insurance attached " at St. Louis," and could not attach as to any part of the cargo received on the way, is founded upon a confusion of this insurance upon freights with an insurance upon cargo, and the authority cited by defendant's counsel, to the point that this policy could cover nothing but

freight on the cargo actually on board when the vessels left port, is not applicable to this case.

It is admitted by counsel for defendant that, in cases of insurance of freight, a sum is insurable larger than could possibly be realized by the safe arrival of the vessel at her destined port; so that there is no difficulty on the evidence as to insurable interest.

. The policy was not a valued policy, but was for "a total loss of any part of the freight;" and the present loss was a total one.

We are of opinion, therefore, that no error was committed by the Circuit Court in refusing the second, third, and fourth of instructions asked for the defendant; that there was no error in refusing instruction No. 1; and that no error to warrant a reversal appears on the record.

It is urged by defendant that, inasmuch as it appears by the record that three of the parties are bankrupt, they cannot maintain this action. The evidence shows that, at the date of the policy and of the loss, plaintiffs owned the boat and chartered the .barge, and were the persons insured. After the commencement of this suit they formed a corporation, and the present claim was, with other assets, assigned to the new company. Defendant says that this assignment was not so made as to vest title.

These questions are wholly immaterial, as far as defendant is concerned. It appears, as to the plaintiffs who are adjudicated bankrupts, that their estate has no interest in, and their assignee disclaims any right in, this cause of action. If the transfer to the company was not validly made, then the right of action did not pass to the new company; if the right of action did not pass, the undertaking for costs having been properly filed, the action is rightly continued, under our statute, in the name of the original party. Wag. Stat. 1050, sec. 9. The then plaintiffs, formerly composing the firm of Stilwell, Powell & Co., although adjudi-

cated bankrupts after the commencement of the suit, even should it be held that the transfer to the company was not validly made before bankruptcy, would seem to be properly parties of record, the assignee not having asked to be substituted as a party. Plaintiffs then remain as nominal parties, and trustees for the real party in interest, if it should be the fact that their interest in this claim has, during the pendency of the suit, passed by operation of law to an assignee for their creditors.

In any case, there could be no second recovery of this claim against defendant by the assignee of Stilwell, Powell & Co., and the debt will be discharged by satisfaction of this judgment. If the defendants entertained any fear of paying to the wrong party, they should have filed a bill of interpleader.

The judgment of the Circuit Court is affirmed. The other judges concur.